UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTIAAN CILLIERS, DAPHNE CILLIERS, WORLD WIFI NETWORK, and SUNRISE GLOBAL MARKETING, INC., </br></br>Plaintiffs,</br></br>v.</br></br>COBALT HOLDINGS, INC., PAUL A. MOORE, LAWRENCE G. MALONE, and PHILIP G. ALLEN,</br></br>Defendants. | No. 18 C 2428</br></br>Magistrate Judge M. David Weisman |

**MEMORANDUM OPINION AND ORDER**

In their fourth amended complaint, plaintiffs sue defendants for breach of contract, fraud, conversion, and violating the Fair Labor Standards Act ("FLSA") and Illinois Wage Payment and Collection Act ("IWPCA"). Defendants have moved pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss the IWPCA (Counts VI and VII) and FLSA claims (Count X) and various damage claims. For the reasons set forth below, the Court grants in part and denies in part the motion.

**Facts**

Plaintiffs, Daphne and Christiaan Cilliers, are shareholders of World WiFi Network ("WWN") and Sunrise Global Marketing, Inc. ("SGM"). (4th Am. Compl., ECF 99 ¶¶ 6-7.) By late 2015, plaintiffs, through their companies, had developed a working network of nearly one hundred high speed WiFi hotspots in thirteen countries throughout the Caribbean. (*Id.* ¶ 16.)

Plaintiffs had also developed "Internet advertising assets that had generated over $1.9 million in advertising revenue." (*Id.* ¶ 18.)

In 2015, defendant Cobalt set out to acquire plaintiffs' WiFi network and advertising assets. (*Id.* ¶ 22.) Cobalt executives and agents made numerous false representations to plaintiffs to induce them to sell to Cobalt. (*Id.* ¶ 23.) Plaintiffs relied on these misrepresentations and agreed to sell their network and assets to Cobalt. (*Id.* ¶ 26.)

On April 21, 2016, Christiaan signed two agreements with Cobalt, one on behalf of WWN (the "Network Agreement") and the other on behalf of SGM (the "SGM Agreement"), in which Cobalt purchased all of those entities' assets. (*Id.* ¶¶ 27-28.) The Network Agreement required Cobalt to issue 31,036 shares of Cobalt common stock to WWN, to pay $25,000 at closing, and additional $25,000 within ninety days of the closing. (*Id.* ¶ 36.) Cobalt did not pay the first installment in full until December 2016, and never paid the second installment. (*Id.* ¶¶ 38-42.)

The SGM Agreement required Cobalt to give plaintiffs two-year, renewable employment agreements with Cobalt and to issue 87,180 shares of Cobalt common stock to the Cilliers as follows:

> A. Equity Consideration. Cobalt will issue to the Sellers 41,026 shares of Cobalt Common Stock, subject to an Escrow Agreement for a portion of the Common Stock;
>
> B. Earn-Out. As more fully described in Schedule F Cobalt will reserve 46,154 shares of Cobalt Common Stock to be issued to the Sellers upon satisfaction of the following conditions:
>
>> a. 25,641 shares to be issued if advertising related to the purchased assets achieves trailing 12 months sales of at least $200,000 at any point during the first 24 months following the Closing. Such sales must yield a gross margin of at least 60% to be included in the Earn Out.
>>
>> b. 20,513 shares to be issued if Cobalt achieves total hotspots of 400 sites within the first 24 months following the Closing including existing hotspots being purchased by Cobalt from WorldWifi Network in a separate transaction and

> inclusive of hotspots installed by Cobalt without the assistance of the Sellers. The location of each hotspot shall be approved by Cobalt.

(*Id.* ¶¶ 43, 46.) The earn-out provision was more fully described in an Earn-Out Agreement, which was attached as a schedule to the SGM Agreement. (*Id.* ¶ 47.) Among other things, the Earn-Out Agreement states: "In the event the employment agreement between Cobalt and Christiaan Cilliers is terminated without cause during the first 24 months of the term of the employment agreement, the Earn Out shares shall be issued." (*Id.* ¶ 50.)

The SGM Agreement required Cobalt to transfer 20,513 shares of Cobalt common stock to plaintiffs at closing and hold an additional 20,513 shares in escrow until Cobalt's 2016 audit was complete or eighteen months after the initial 20,513 shares were issued, whichever was sooner. (*Id.* ¶¶ 51-52.) Cobalt issued the initial 20,513 shares to plaintiffs on May 2, 2016, but it cancelled the shares after plaintiffs filed this suit. (*Id.* ¶ 53.) Cobalt never issued the additional 20,513 shares to plaintiffs. (*Id.* ¶ 54.)

On September 7, 2017, Cobalt terminated plaintiffs' employment agreements, claiming that it had "cause" to do so. (*Id.* ¶ 60S, T.) Cobalt failed to pay Christiaan: (1) all wages due for May 16, 2017 through May 31, 2017 and August 1, 2017 through September 7, 2017; (2) severance pay due under the agreement; (3) options to purchase 5,000 shares of Cobalt's common stock per annum; (4) the acceleration of 46,154 Earn-Out shares of Cobalt common stock; and (5) overtime wages for 2016 and 2017. (*Id.* ¶ 102.) Cobalt failed to pay Daphne: (1) her full compensation for days worked from September 1 through September 7, 2017; and (2) her severance payment. (*Id.* ¶ 108.)

3

**Discussion**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation omitted)

In Counts VI, VII and X of the fourth amended complaint, plaintiffs allege that Cobalt, Moore, and Malone violated the IWPCA and FLSA by failing to pay plaintiffs the compensation they are due. Defendants contend that these claims should be dismissed because plaintiffs are required by their employment agreements to arbitrate them. (*See* 4th Am. Compl., Ex. 2, Schedule E, Employment Agreements, ECF 99-2 § 8 ("Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration . . . .").)

However, Rule 12(b)(6) is not the mechanism for enforcing an arbitration clause. Rather, as the Seventh Circuit has stated, "the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings pending arbitration rather than to dismiss outright." *Cont'l Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 732 n. (7th Cir. 2005); *see* 9 U.S.C. § 3 ("If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .").

4

Because the existence of the arbitration agreement, the validity of which the Court does not decide, is not a basis for dismissing the IWPCA or FLSA claims, defendants' motion to dismiss on that basis is denied.

Alternatively, defendants say plaintiffs' IWPCA claims fail as a matter of law because plaintiffs did not perform any work for defendants in Illinois. In relevant part, the IWPCA states that it "applies to all employers and employees in this State." 820 Ill. Comp. Stat. 115/1. The Illinois Supreme Court has not addressed whether "employees in this State" includes non-resident employees who work for employers located in Illinois. Thus, the Court must predict how the Illinois Supreme Court would rule on that issue. *Adams v. Catrambone*, 359 F.3d 858, 862 (7th Cir. 2004). If, however, the Seventh Circuit has already made that prediction, the Court is bound by the Seventh Circuit's decision, even if subsequent state appellate court decisions diverge from the Seventh Circuit's interpretation. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("[U]nder *Erie* our task in diversity litigation is to predict what the state's highest court will do. Once the state's highest court acts, the need for prediction is past. But decisions of intermediate state courts lack similar force . . . . [T]hey do not themselves liberate district judges from the force of our decisions.").

The Seventh Circuit has said this about the IWPCA:

> The act "applies to all employers and employees in this State." 820 ILCS 115/1. The plaintiff is not, and at no time relevant to this suit was he, a resident of Illinois. Nor did he perform any work in Illinois; all the work that he did for the defendants was done in Spain. Although the employer defendants have their principal places of business in Illinois, and are therefore "employers . . . in this State," we do not think the statute has an extraterritorial reach. Its evident purpose is to protect employees *in Illinois* from being stiffed by their employers.

*Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998) (emphasis in original). Though a subsequent state appellate decision, *Watts v. Addo Management, LLC*, 97 N.E.3d 75, 82 (Ill. App.

5

Ct. 2018), suggests that the Act may apply even when "all of the work is performed outside of this state," this Court is bound to follow *Glass*. Because plaintiffs do not allege that they are residents of Illinois or performed any work here, they have not stated viable IWPCA claims. Defendants' motion to dismiss Counts VI and VII is therefore granted.

In Counts III and IV, plaintiffs seek compensatory damages for defendants' alleged breach of the Network and SGM Agreements. Defendants contend that the Agreements preclude plaintiffs from recovering such damages. The Agreements state that "the indemnification provisions . . . shall be the exclusive rights and remedies of the parties . . . for any Losses arising out of any breach of representations, warranties, covenants and obligations made in th[e] Agreement[s]." (4th Am. Compl., Exs. 1 & 2, ECF 99-1 & 99-2 § 5.7.) The Agreements further state:

> From and after the Closing, Cobalt will reimburse, indemnify and hold harmless WWN [and SGM] and its directors and officers (each, an "Indemnified WWN Party" [or "Indemnified SGM Party"]) against and in respect of any and all damages, losses, deficiencies, liabilities, assessments, fines, judgments, costs and other expenses (including reasonable legal fees and expenses) incurred or suffered by any Indemnified WWN [and SGM] Party that result from, relate to or arise out of:
>
> (a) Any nonfulfillment or breach of any agreement or covenant on the part of Cobalt under this Agreement, or any certificate, schedule, exhibit, document, agreement or instrument furnished to WWN [or SGM] pursuant hereto, or in connection with the execution or performance of this Agreement; and claims made by third parties that arise out of, are based upon or allege any such act, breach or nonfulfillment or that are inconsistent with the accuracy of any such representation or warranty or the fulfillment of any such agreement or covenant.

(*Id.* § 5.2.) The plain language of this provision permits plaintiffs to recoup from defendants "any and all damages . . . incurred . . . by [plaintiffs] that result from, relate to or arise out of . . . [a]ny nonfulfillment or breach of any agreement or covenant on the part of Cobalt under th[e] Agreement[s]." (*Id.*); *see C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782

(Ill. App. Ct. 1999) ("If a contract is clear and unambiguous, the court must determine the intent of the parties solely from the plain language of the contract.").[1] Thus, defendants' motion to dismiss plaintiffs' claims for compensatory damages from Counts III and IV is denied.

Defendants also contend that § 5.7 of the Agreements bar plaintiffs' punitive damages claims for fraud and conversion. The relevant part of that section states: "[T]he parties shall not be deemed to have waived any rights, claims, causes of action or remedies . . . in instances of fraud. Notwithstanding anything contained in this Agreement to the contrary, no Person shall be liable to any other Person for . . . punitive damages." (4th Am. Compl., Exs. 1 & 2, ECF 99-1 & 99-2 § 5.7.) Plaintiffs focus solely on the first sentence of that provision; defendants focus solely on the second. But the sentences must be construed together. *J.M. Process Sys., Inc. v. W.L. Thompson Elec. Co.*, 578 N.E.2d 264, 267 (Ill. App. Ct. 1991). Read together, the second sentence limits the scope of the first sentence to claims other than punitive damages. In other words, notwithstanding the reservation of rights for fraud claims, the parties agreed that punitive damages are not recoverable.

Plaintiff argues, however, that this clause is unenforceable with respect to the fraud and conversion claims because, as a matter of Illinois law, an exculpatory clause "cannot protect persons from the results of their willful and wanton misconduct . . . [or] intentional wrongdoing." (Pls.' Resp. Mot. Dismiss., ECF 103 at 12.) The Court agrees. *See Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., LLC*, No. 02 C 5403, 2003 WL 22595263, at *11 n.14 (N.D. Ill. Nov. 7, 2003), *aff'd sub nom. Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706 (7th Cir. 2005) ("Illinois law is clear that exculpatory clauses are not enforceable to insulate a party against responsibility for its own intentional torts—most particularly fraud.") (quotation omitted); *Falkner*

---

[1] The Agreements contain Illinois choice-of-law provisions. (*See* 4th Am. Compl. Exs. 1 & 2, ECF 99-1 & 99-2 § 6.11.)

*v. Hinckley Parachute Ctr., Inc.*, 533 N.E.2d 941, 946 (Ill. App. Ct. 1989) ("Generally, agreements exculpating from the results of wilful and wanton misconduct are illegal."); *Zimmerman v. Northfield Real Estate, Inc.*, 510 N.E.2d 409, 415 (Ill. App. Ct. 1986) (holding that an exculpatory clause did not shield defendants from liability for an intentional tort); *Moss v. Hunding*, 169 N.E.2d 396, 399 (Ill. App. Ct. 1960) ("If we were to construe the clause as . . . reliev[ing] the lessors of liability for intentional torts committed by them . . . . [,] [s]uch an interpretation would be unreasonable and oppressive."); see *Loman v. Freeman*, 890 N.E.2d 446, 462 (Ill. 2008) (characterizing conversion as an intentional tort). Thus, defendants' motion to dismiss the punitive damages claims is denied.

## Conclusion

For the reasons set forth above, the Court grants in part and denies in part defendants' motion to dismiss certain claims from the fourth amended complaint [100]. The motion is granted with respect to the IWPCA claims asserted in Counts VI and VII, which are dismissed without prejudice. The motion is otherwise denied. Plaintiffs have fourteen days from the date of this Order to amend the IWPCA claims, if they can do so and comply with Rule 11. If plaintiffs fail to amend the claims in that period, the dismissal will become with prejudice.

**SO ORDERED.**       **ENTERED: April 8, 2019**

**M. David Weisman**
**United States Magistrate Judge**